**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| R. L'HEUREUX LEWIS-MCCOY, JAMIL DAKWAR, and JOHN HARLAND GIAMMATTEO, on behalf of themselves and all similarly situated individuals,<br><br>                Plaintiffs,<br><br>     v.<br><br>CHAD WOLF, in his official capacity as Acting Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARK MORGAN, in his official capacity as Acting Commissioner of United States Customs and Border Protection; and UNITED STATES CUSTOMS AND BORDER PROTECTION,<br><br>                Defendants. | Case No. 1:20-cv-1142<br><br><br><br><br>**CLASS ACTION**<br>**COMPLAINT** |

**INTRODUCTION**

1.      This class-action lawsuit challenges the most recent effort by the Trump Administration to target immigrants and the states that seek to protect them.  From the very day of his inauguration, President Trump has imposed a wide range of punitive, discriminatory, and irrational measures on immigrant communities in the United States, as well as on refugees and asylum-seekers fleeing violence and persecution abroad. New York, which is home to millions of immigrants, has been a particular target for President Trump.

2.      In last week's State of the Union address, President Trump singled out New York for criticism because of efforts taken in the State to protect immigrant communities. One day later, President Trump's Acting Secretary of Homeland Security, Chad Wolf, announced a

blanket ban on New York residents' eligibility to enroll or re-enroll in various programs that enable vetted and approved travelers entering the United States to expedite the border clearance process. The best known of these programs is Global Entry, a program for which millions of people have been approved, including hundreds of thousands of New Yorkers.

3.     The Trump Administration claims this abrupt and unprecedented ban on New Yorkers' participation in the Global Entry program is necessitated by security concerns raised by New York's recently enacted Green Light Law. That law, which authorizes the issuance of driver's licenses regardless of citizenship or immigration status, limits federal immigration officials' access to state Department of Motor Vehicles records. But the Administration's claim is specious. In fact, that access would provide no relevant information not otherwise available about many if not most New York residents applying for Global Entry, and any information DMV alone may possess would have little or no bearing on their eligibility for the program.

4.     In truth, the Trump Administration's closing of Global Entry and the other expedited-traveler programs to New Yorkers is little more than an attempt to coerce New York into participating in federal immigration enforcement by forcing State officials into disclosing sensitive data about driver's license applicants. To accomplish this, the administration has unlawfully banned millions of otherwise-eligible New Yorkers from even applying for Global Entry and the other programs. The ban immediately affects about 80,000 New York residents whose applications were pending when the ban went into effect and another 175,000 whose memberships will expire this year but will be barred from attempting to re-enroll.

5.     The Trump Administration's abrupt and summary termination of Global Entry for New York residents is simply another punitive and irrational measure directed at immigrant communities and is one that undermines public safety. It violates the Administrative Procedure

Act and the United States Constitution, and the plaintiffs respectfully seek a declaration that the termination is unlawful, an order enjoining it, and attorney's fees.

## PARTIES

### *Named Plaintiffs*

6.     Plaintiff R. L'Heureux Lewis-McCoy is a resident of New York, New York whose application to Global Entry was pending when the defendants barred all New York residents from the program.

7.     Plaintiff Jamil Dakwar is a resident of New York, New York whose application to Global Entry was pending when the defendants barred all New York residents from the program.

8.     Plaintiff John Harland Giammatteo is a resident of New York, New York who wishes to enroll in Global Entry but cannot because the defendants have barred all New York residents from the program.

### *Defendants*

9.     Defendant Chad Wolf is the Acting Secretary of the United States Department of Homeland Security. He is sued in his official capacity.

10.     Defendant United States Department of Homeland Security ("DHS") is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f). DHS is the parent agency of United States Customs and Border Protection and United States Immigration and Customs Enforcement ("ICE").

11.     Defendant Mark Morgan is the Acting Commissioner of United States Customs and Border Protection. He is sued in his official capacity.

12.     Defendant United States Customs and Border Protection ("CBP") is a component agency of DHS, and is an agency within the meaning of 5 U.S.C. § 552(f). It is the law-

enforcement agency primarily tasked with border protection. CBP administers various programs, including Global Entry, that provide expedited entry into the United States for program members.

## FACTS

### *The Trump Administration's Retaliation Against Jurisdictions that Do Not Enforce Its Anti-Immigrant Agenda*

13.     Since the beginning of his presidency, President Trump has pursued a cruel anti-immigrant agenda that has sought to vilify and scapegoat immigrants. President Trump has repeatedly made derogatory comments about immigrants, calling undocumented immigrants "animals," saying, "You wouldn't believe how bad these people are. These aren't people, these are animals . . . ."[1] He further referred to undocumented immigrants as an "infestation" and compared immigrants and refugees to a "snake" that will "bite[]" those who help it.[2]

14.     Just days after the inauguration, the Trump Administration openly targeted states and municipalities that limit their cooperation with immigration authorities in an effort to protect immigrant communities. On January 25, 2017, President Trump issued Executive Order 13768, which unlawfully threatened to deny federal grant funding to all so-called "sanctuary jurisdictions." The White House confirmed the order's clear purpose: "We're going to strip federal grant money from the sanctuary cities and states that harbor illegal immigrants."

---

[1] Julie Hirschfield Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), https://www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.
[2] Donald J. Trump (@realDonaldTrump), Twitter (June 19, 2018, 9:52 am), https://twitter.com/realdonaldtrump/status/1009071403918864385;  Dan Merica, *Trump reads 'The Snake,' repurposed as anti-immigrant poem, at CPAC*, CNN (Feb. 25, 2018), at https://www.cnn.com/2018/02/23/politics/trump-the-snake-song/index.html.

15.     In January 2018, President Trump claimed so-called "sanctuary cities" were "the best friends of gangs and cartels." In March 2018, the Trump Administration sued the State of California to enjoin three state laws that protect immigrants and limit the information that state officials may share with federal immigration enforcement authorities. In April 2018, Trump made derogatory comments about sanctuary cities in California, saying "many Sanctuary areas want OUT of this ridiculous, crime infested & breeding concept."[3]

16.     Similarly, on April 12, 2019, President Trump confirmed reports that his administration was planning to send undocumented immigrants to "Sanctuary Cities," tweeting: "Due to the fact that Democrats are unwilling to change our very dangerous immigration laws, we are indeed, as reported, giving strong considerations to placing Illegal Immigrants in Sanctuary Cities only."[4]

17.     Defendant Wolf has echoed the President's views. In December 2019 he stated, "[S]anctuary policies do not protect communities, they endanger them," and referred to such policies as "devastating."  On January 15, 2020, he tweeted, "There has been a complete breakdown of law & order in New York City. NYC proudly passed sanctuary city laws & bragged about it for months. But now they, & more importantly, the citizens of NYC are facing the deadly consequences of the sanctuary policies."[5]

18.     President Trump has taken particular aim at New York and its support of immigrant communities. At the State of the Union on February 4, 2020, President Trump cited

---

[3] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 18, 2018, 5:59 am), https://twitter.com/realdonaldtrump/status/986544648477868032?lang=en.

[4] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 12, 2019, 12:38 pm), https://twitter.com/realdonaldtrump/status/1116742280919044096?lang=en.

[5] Acting Secretary Chad Wolf (@DHS_Wolf), Twitter (Jan. 15, 2020, 7:14 pm), https://twitter.com/dhs_wolf/status/1217600924744585216?lang=en.

New York specifically and repeated his false claims about sanctuary cities being havens for crime.

***New York's Driver's License Access and Protection Act***

19.     In stark contrast to the Trump Administration, New York officials have sought to protect immigrant communities from hyper-aggressive and unwarranted enforcement measures, both as a matter of respect and to promote public safety.

20.     In June 2019, New York State enacted the Driver's License Privacy and Protection Act, commonly referred to as the "Green Light Law." That law, which went into effect on December 14, 2019, authorizes the issuance of standard driver's licenses regardless of citizenship status.

21.     Concerned about the Trump Administration's attacks on immigrants and its pattern of seeking to coerce states into engaging in federal immigration enforcement, New York State chose to include in its Green Light Law restrictions on access to databases that are maintained by its Department of Motor Vehicles ("DMV") and that contain certain information about those applying for driver's licenses. Specifically, absent a judicial warrant, the Green Light Law bars access to DMV-maintained records by "any agency that primarily enforces immigration law," including CBP and ICE.

***The Global Entry Program***

22.     The federal government operates several programs designed to expedite border crossings for vetted and approved travelers. Referred to generally as "Trusted Traveler Programs," the best known of these programs is Global Entry.

23.     Global Entry allows expedited border clearance for pre-approved, low-risk travelers arriving to the United States. Upon arrival in the United States at many airports, a

program member may proceed to a Global Entry kiosk, present their machine-readable passport or U.S. permanent resident card, place their fingerprints on the scanner for fingerprint verification, and complete a customs declaration. The Global Entry kiosk issues the traveler a transaction receipt and directs the traveler to baggage claim and the exit.

24.     The federal government has approved millions of people to participate in Global Entry, including qualifying U.S. citizens, lawful permanent residents, and citizens of 11 other countries with whom CBP has made certain arrangements.[6] Membership in Global Entry includes the TSA PreCheck benefit, which expedites traveler screening through domestic airport security checkpoints.

25.     DHS established Global Entry and the other Trusted Traveler Programs pursuant to a statute directing the Secretary of DHS to "establish an international registered traveler program" in order to "expedite the screening and processing of international travelers, including United States Citizens and residents, who enter and exit the United States."

26.     In requiring DHS to create the program, Congress found that expediting "the travel of previously screened and known travelers across the borders of the United States should be a high priority" and that the "process of expediting known travelers across the borders of the United States can permit inspectors to better focus on identifying terrorists attempting to enter the United States."

27.     To that end, Congress provided that DHS "shall ensure that the international registered traveler program includes as many participants as practicable by (i) establishing a reasonable cost of enrollment; (ii) making program enrollment convenient and easily accessible; and (iii) providing applicants with clear and consistent eligibility guidelines."

---

[6] Those countries are Argentina, Columbia, Germany, India, Mexico, Panama, Singapore, South Korea, Switzerland, and Taiwan.

28.     In June 2008, CBP began operating a pilot Global Entry program, which was successful. According to the agency's analysis of the pilot program, "The increased volume of traffic to the kiosks by proven low-risk travelers allows CBP officers more time and resources to address higher risk security concerns" and thereby improve overall security.

29.     CBP issued a notice of proposed rulemaking to establish Global Entry as permanent program on November 19, 2009 and published a final rule on February 6, 2012. Global Entry has since been available across the country.

30.     Consistent with the congressional mandate to maximize participation in the program, the eligibility criteria for applying for the program are broad. Specifically, the program is open to any U.S. citizen, U.S. national, U.S. lawful permanent resident, and "'nonimmigrant aliens' from countries that have entered into arrangements with CBP concerning international trusted traveler programs." Additionally, any applicant under the age of 18 must have the consent of a parent or legal guardian. All applicants must have a valid "machine-readable passport, a valid machine readable U.S. Lawful Permanent Resident Card (Form I-155), or other appropriate travel document as determined by CBP."

31.     Global Entry's criteria do not require applicants to have a driver's license, a driving record, or even residence in the United States.

32.     Under these criteria, upon information and belief, millions of New York residents are eligible to apply for Global Entry.

33.     When applying for Global Entry, applicants must provide extensive personal information, including name, date of birth, city of birth, country of birth, state of birth, e-mail address, phone number, gender, eye color, height, and prior names used. The applicant must also

provide information indicating proof of citizenship and proof that the applicant may enter the country, like a passport or lawful permanent resident card.

34.    A non-refundable fee of $100 is required with each completed application to submit the application.

35.    Once they have submitted their applications, applicants undergo a multi-prong screening process.  As part of that process, CBP routes the applications to a vetting center where their biographic information contained in the applications is queried against 21 different data systems, including:

     a.  UPAX, a consolidated database that includes information to help identify "potential terrorists, transnational criminals, and other persons who pose a higher risk of violating U.S. law";

     b.  TECS, data repository that supports "law enforcement 'lookouts,' border screening, and reporting for CBP's primary and secondary inspection processes";

     c.  IDENT, which stores and processes biometric data "to establish and verify identities," including biometric information from INTERPOL;

     d.  The FBI's National Crime Information Center's Interstate Identification Index, an automated database that integrates criminal history records from federal, state, local, tribal, and certain foreign criminal justice agencies; and

     e.  TSDB, a consolidated database maintained by FBI's Terrorist Screening Center that "provides information about those known or reasonably suspected of being involved in terrorist activity."

36.    CBP also claims that prior to the Green Light Law, it accessed information from New York's DMV records as part of the Global Entry vetting process related to aspects of an individual's criminal history. It is unclear, however, that New York's DMV data related to possible criminal offenses is not available elsewhere. Moreover, upon information and belief, the only information that is potentially uniquely in DMV records relates to an individual's New

York driving record — if they even have one — including convictions for driving while under the influence of drugs or alcohol.

37.     After the vetting process, if CBP conditionally approves the application, the applicant is notified to schedule an interview at an approved Global Entry Enrollment Center or certain international airports upon arrival in the United States.

38.     On the date of the scheduled interview, the applicant is required to bring their application documents and one other form of identification, like a government-issued identification card. At the interview, CBP conducts a personal interview, obtains biometric information (including a set of fingerprints and a digital photograph), and addresses any additional eligibility questions.

39.     Once an application is approved, the new member receives a Global Entry card. Membership in the Global Entry program lasts for a period of 5 years so long as the application is not suspended or terminated by CBP.

40.     Global Entry program members may renew their enrollment beginning one year prior to the expiration of the five-year membership. If the member submits a renewal application before their prior Global Entry membership expires, that applicant is allowed to use their Global Entry card for up to six months after the membership application date regardless of whether the card expires, in case the renewal does not get processed prior to expiration.

41.     A participant in Global Entry "may be suspended or removed from the program" for reasons including that they no longer meet the program eligibility criteria, or that CBP "determines that such action is otherwise necessary."  The regulations further provide that "[i]f an applicant is denied participation in Global Entry, CBP will notify the applicant of the denial,

and the reasons for the denial. CBP will also provide instructions regarding how to proceed if the applicant wishes to seek additional information as to the reason for the denial."

42.     The background-check requirements that CBP imposes on Global Entry applicants who are foreign nationals living outside the U.S. vary by country. For example, applicants who are resident in Taiwan must "obtain a Police Criminal Record Certificate from their local Taiwan Police Department," but there is no such requirement on applicants living in Panama.

43.     Upon information and belief, CBP has approved Global Entry applications from non-residents — including both U.S. and non-U.S. citizens — residing in jurisdictions that do not share with the defendants the particular information that they now purport CBP requires to determine the Global Entry eligibility of New York residents.

### DHS Bans All New York Residents from Global Entry and Other TTPs.

44.     In his State of the Union address on February 4, 2020, President Trump singled out New York for criticism because of efforts in the state to protect immigrants. The following day defendant Wolf announced on Fox News's *Tucker Carlson Tonight* that he had sent a letter to New York officials immediately suspending enrollment and re-enrollment in Global Entry and other Trusted Traveler Programs ("TTPs") for all New York State residents.

45.     Defendant Wolf's February 5 letter announced an unprecedented change to the eligibility requirements for Global Entry and other TTPs: "New York residents will no longer be eligible to enroll or re-enroll in CBP's Trusted Traveler Programs," including Global Entry (the "New York Ban").

46.     In announcing the New York Ban, defendant Wolf claimed banning New York's nearly 20 million residents from applying for Global Entry was necessitated by the provision of the New York's Green Light Law that bars immigration officials from accessing the state's DMV records. In support of this sweeping action, however, the letter offers only one rationale: "The [Green Light Law] prevents DHS from accessing relevant information that only New York DMV maintains, including some aspects of an individual's criminal history." The letter does not identify the specific information it refers to and offers little explanation as to how losing access to that information affects the Global Entry vetting process.

47.     Notably, this rationale does not apply to over 3.5 million New York residents for whom DMV maintains no records but who may otherwise be eligible to apply for Global Entry.

48.      Most of defendant Wolf's letter makes clear that DHS's termination of Global Entry for New York residents is simply an attempt to force New York officials to cooperate in federal immigration enforcement by making DMV records available to ICE. While spending precious little time explaining any actual impact on Global Entry, defendant Wolf's letter devotes substantial space to claiming that losing access to DMV records has impaired law-enforcement activities by ICE.

49.     On February 6, 2020, CBP issued a press release entitled "New York Residents No Longer Eligible to Apply for or Renew Trusted Traveler Programs."  The release states:

> Effective immediately, . . . . New York residents will no longer be eligible to apply for or renew membership in CBP Trusted Traveler Programs and CBP will cancel all pending Trusted Traveler Program applications submitted by residents of New York. Refunds will be processed automatically.

50.     At the time of the filing of this complaint, notifications on CBP's website, including on the webpage for Global Entry, confirm that New York residents are ineligible for Global Entry:

12



51.    New York State residents who attempt to enroll in the Global Entry program online now receive an error message and cannot complete their applications:



52.    Similarly, a fact sheet provided by the Government to an applicant turned away from his interview at JFK International Airport on February 9 states clearly that CBP has cancelled all applications for residents of New York: "Conditionally approved TTP applicants

pending an enrollment interview and TTP applications pending risk assessment will be cancelled and issued a fee reimbursement."

53.     Upon information and belief, the New York Ban affects approximately 255,000 New York State residents.  Over 80,000 residents — like named plaintiffs Lewis-McCoy and Dakwar — had pending applications for enrollment or reenrollment in Global Entry and other TTPs when the New York Ban went into effect. And by the end of 2020, approximately 175,000 New Yorkers who have been vetted and approved will be removed from TTPs, including Global Entry, because they now are barred from re-enrolling. Beyond those whose current enrollment or pending applications are immediately affected, the New York Ban bars millions of other New York residents — like named plaintiff Giammatteo — who might want to apply for the first time from doing so.

54.     Upon information and belief, the curtailing of CBP access to New York's DMV records has little if any effect on the agency's ability to assess applicants for Global Entry.

55.     As an initial matter, DMV possesses no records regarding millions of New York residents eligible to apply for Global Entry. Many New York residents do not drive and have never applied for a driver's license.

56.     As for those New York residents about whom DMV may possess records, upon information and belief many if not most of those records will contain no information that CBP itself would consider relevant to approval for Global Entry that it does not otherwise access through its other vetting processes.

57.     Even for those New York residents whose DMV records contain information CBP might consider relevant to approval for Global Entry, that information is of extremely limited

consequence given that the only information that DMV alone may possess potentially involves certain driving-related offenses.

58.     Finally, before the passage of the Green Light Law, CBP may not have consistently accessed DMV records as part of its Global Entry vetting process. The plaintiffs are unaware of any reports or evidence establishing that CBP was using DMV records in this way.

59.     Not only does the New York Ban bar millions of New York residents about whom DMV records contain little or no relevant information, it leaves the program open to persons about whom those records may contain considerable relevant information. Specifically, any person who moves out of New York — for instance to adjoining New Jersey, Connecticut, or Pennsylvania — becomes eligible to apply for Global Entry. A fact sheet provided to an applicant turned away from his interview at JFK International Airport on February 9 states, "If there has been a change in residence (outside i.e., [sic] if an applicant moves from the State of New York to a different state) applicants may reapply with their new information."

60.     Under the New York Ban, a U.S. citizen currently residing in New York could become eligible to apply by moving abroad and establishing residence in *any* foreign in country in the world, regardless of CBP's ability to obtain intelligence regarding persons residing in the country. Similarly, under the ban, citizens of Argentina or Germany or India are eligible to apply for Global Entry *if they reside in their home country*, but would lose that eligibility if they moved to New York.

61.     Neither DHS nor CBP has ever before singled out residents of just one state to ban them from Global Entry or any other Trusted Traveler Program.

62.     Upon information and belief, CBP has not notified individual applicants of their application statuses as a result of the New York Ban.

15

63.     As of the time of filing of this complaint, DHS has adopted a new force-of-law

eligibility requirement — non-residence in New York — that governs the Global Entry program,

without having followed the required notice-and-comment rulemaking process.  Indeed, New

York officials were surprised by the sudden announcement and did not have the opportunity to

engage with DHS over its alleged concerns.

64.     Addressing the New York Ban, Ken Cuccinelli, the Senior Official Performing

the Duties of the Deputy Secretary of Homeland Security, warned other states about passing laws

similar to New York: "I know that the state of Washington is looking at a law like New York's

'Green Light Law.'" He further threatened, "They should know that their citizens are going to

lose the convenience of entering these Trusted Traveler Programs, just as New York's did."

65.     Mr. Cuccinelli has also threatened New Yorkers' future participation in the

Transportation Security Administration PreCheck program, saying "PreCheck is not currently on

the list (of affected programs), but that is all I'll say about that. It doesn't mean it can't be in the

future."


***The Named Plaintiffs' Attempts to Enroll in Global Entry***

***R. L'Heureux Lewis-McCoy***

66.     Plaintiff R. L'Heureux Lewis-McCoy is a U.S. citizen who resides in New York,

New York. He is an Associate Professor of Sociology of Education at the New York University

Steinhardt School of Culture, Education, and Human Development.

67.     Mr. Lewis-McCoy wishes to enroll in the Global Entry program to make

international travel with his family and young children more convenient. Mr. Lewis-McCoy also

hopes to teach a study abroad course, so Global Entry would help make his work-related travel smoother.

68.     Mr. Lewis-McCoy has a valid, machine-readable U.S. passport and is eligible to apply for Global Entry.

69.     Mr. Lewis-McCoy submitted a complete application for Global Entry online on October 21, 2019, and paid the required $100 application fee. His application was vetted and, upon information and belief, during the vetting process (and before the implementation of the Green Light Law), CBP had access the New York DMV information it claims it needs.  Mr. Lewis-McCoy received his "conditional approval" to schedule an interview.

70.     On November 5, 2019, Mr. Lewis-McCoy completed his in-person interview for his application for Global Entry at an approved enrollment center located on NYU's campus. During the interview, Mr. Lewis-McCoy answered the agent's routine questions like his name, date of birth, and the countries where he had travelled recently.  The agent scanned a copy of his passport and his New York state driver's license. She also took his picture and scanned his hand. Before the interview ended, the agent gave Mr. Lewis-McCoy her contact information and said that if he wanted to enroll his family in the program, as well, he could contact her and she would help enroll them.

71.     After he learned New York residents would no longer be able to enroll in the Global Entry Program, Mr. Lewis-McCoy signed into his TTP portal account. His pending application no longer appears on his TTP dashboard and, upon information and belief, his application has been cancelled.

*Jamil Dakwar*

72.     Plaintiff Jamil Dakwar is a U.S. citizen who resides in New York, New York. He is the Director of the American Civil Liberties Union's Human Rights Program, and an adjunct professor at Hunter College, Bard College, and John Jay College of Criminal Justice.

73.     Mr. Dakwar is a frequent international traveler and wishes to enroll in the Global Entry to enjoy the convenience of expedited border processing when he returns to the United States.

74.     Mr. Dakwar has a valid, machine-readable U.S. passport and meets is eligible to apply for Global Entry.

75.     Mr. Dakwar submitted his Global Entry application online on January 9, 2020, and paid the required $100 application fee.

76.     Upon information and belief, Mr. Dakwar's application has been cancelled.

*John Harland Giammatteo*

77.     Plaintiff John Harland Giammatteo is a U.S. citizen who lives in New York, New York.  He is an immigration attorney in New York City.

78.     Mr. Giammatteo is a frequent international traveler who wishes to enroll in Global Entry to benefit from expedited processing times at the airport. In addition, he believes that Global Entry membership would result in more predictable travel times, which would allow him to save time and plan his work and personal schedules more efficiently.

79.     Mr. Giammatteo has a valid, machine-readable U.S. passport and is eligible to apply for Global Entry.

80.     Mr. Giammatteo is now barred from applying for Global Entry.

## CLASS ALLEGATIONS

81.     This case is brought as a class action pursuant to Rules 23(a) and 23(b)(2) of the

Federal Rules of Civil Procedure on behalf of all New York State residents whose applications to

enroll or re-enroll in Global Entry were pending at the time of the New York Ban or who

otherwise intend to enroll or re-enroll in Global Entry.

82.     The proposed class is sufficiently numerous that joinder of all members is

impracticable. According to federal officials, approximately 80,000 New York State residents

had applications to enroll in Global Entry and other TTPs pending when the defendants barred

all the state's residents from the programs, and approximately 175,000 others will be barred from

applying to re-enroll in 2020 as their memberships expire. In addition, there are potentially tens

or hundreds of thousands of other New York residents who may wish to apply for Global Entry.

83.     Common questions of law and fact affect the class members, including without

limitation:

   a.   Whether DMV information that CBP purports to require in determining New
        Yorkers' eligibility for Global Entry is otherwise available to the Defendants;

   b.    Whether the defendants' proffered reasons for barring New York residents from
        applying to enroll or re-enroll in Global Entry are pretextual;

   c.   Whether the defendants' proffered reasons for barring New York residents from
        applying to enroll or re-enroll in Global Entry are otherwise arbitrary and
        capricious;

   d.   Whether the defendants exceeded their statutory or regulatory authority by barring
        New York residents from applying to enroll or re-enroll in Global Entry;

e.   Whether the defendants properly observed legal procedure in barring New York residents from applying to enroll or re-enroll in Global Entry; and

f.    Whether the violated the equal sovereignty of the states and Tenth Amendment to the Constitution by barring New York residents from applying to enroll or re-enroll in Global Entry.

84.   The named plaintiffs' claims are typical of those of the class with respect to the legality of the agency action at issue.

85.   The named plaintiffs will fairly and adequately protect the interests of the class. They have suffered injury from the agency action at issue and are ready, willing, and able to serve as class representatives.

86.   Proposed class counsel has extensive experience litigating similar matters on a class-wide basis.

87.   The New York Ban applies generally to the entire class, so that final injunctive relief and corresponding declaratory relief is appropriate respecting the class.

## JURISDICTION AND VENUE

88.   The Court has subject-matter jurisdiction over the plaintiffs' claims under the U.S. Constitution and federal law pursuant to 5 U.S.C. § 702 and 28 U.S.C. §§ 1331.

89.   The declaratory and injunctive relief the plaintiffs seek is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

## FIRST CLAIM FOR RELIEF

### Violations of the Administrative Procedure Act

90.   The defendants' actions as alleged in the Complaint are "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

91.     The defendants' actions as alleged in the Complaint are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

92.     The defendants' actions as alleged in the Complaint are "in excess of statutory jurisdiction, authority, [and] limitations, [and] short of statutory right." 5 U.S.C. § 706(2)(C).

93.     The defendants' actions as alleged in the Complaint are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

**SECOND CLAIM FOR RELIEF**

**Violation of the Tenth Amendment to the United States Constitution**

94.      The defendants' actions as alleged in the Complaint violate the Tenth Amendment to the United States Constitution.

**RELIEF REQUESTED**

Wherefore, the plaintiffs respectfully requests that the Court:

a.     Assume jurisdiction over this matter;

b.     Declare that the defendants' actions violate the Administrative Procedure Act;

c.     Declare that the defendants' actions violate the Tenth Amendment to the United States Constitution;

d.     Enjoin the defendants to rescind the bar on New York residents' applying to enroll or re-enroll in Global Entry;

e.     Award the plaintiffs reasonable attorney's fees and costs; and

f.     Grant any other relief the Court deems just and proper.

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION

By:    */s/ Antony P.F. Gemmell*
       Antony P.F. Gemmell
       Molly K. Biklen
       Jessica Perry
       Jordan Laris Cohen*
       Christopher T. Dunn
       125 Broad Street, 19th Floor
       New York, New York 10004
       212-607-3300
       agemmell@nyclu.org
       jperry@nyclu.org
       jlariscohen@nyclu.org
       mbiklen@nyclu.org
       cdunn@nyclu.org

Dated:      February 10, 2020
            New York, New York

*Counsel for Named Plaintiffs
and the Putative Class*

* Application for admission to the Southern District of New York forthcoming